T.C. Memo. 2014-58

UNITED STATES TAX COURT

ESTATE OF ELWOOD H. OLSEN, DECEASED, ELWOOD T. OLSEN,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1981-12.            Filed April 2, 2014.

<u>Jonathan B. Fellows</u> and <u>Dennis C. Brown</u>, for petitioner.

<u>Joel D. McMahan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>: Respondent determined a deficiency of $482,050.80 in

Federal estate tax with respect to the estate of Elwood H. Olsen, deceased.

[*2]   The issue remaining for decision is whether the estate of Elwood H. Olsen

is required under section 2044[1] to include in the value of Elwood H. Olsen's gross

estate $1,001,905.51, the value on the applicable alternate valuation date of all of

the assets that a certain trust held on the date of his death.  We hold that that estate

is required under section 2044 to include in the value of that gross estate

$607,927.51, the value on the applicable valuation date of only certain of the as-

sets that that trust held on the date of Mr. Olsen's death.

FINDINGS OF FACT

All of the facts in this case, which the parties submitted under Rule 122,

have been stipulated by the parties and are so found except as noted below.[2]

On February 25, 2008, Elwood H. Olsen (Mr. Olsen or decedent), who was

92 years old, died testate in the State of Florida.  Elwood Ty Olsen (Ty Olsen or

personal representative), one of decedent's three children, is the personal repre-

---

[1]All section references are to the Internal Revenue Code in effect on the date
of the death of Elwood H. Olsen.  All Rule references are to the Tax Court Rules
of Practice and Procedure.

[2]Respondent reserved relevancy objections in the parties' supplemental
stipulation of facts to certain stipulated paragraphs therein and certain stipulated
exhibits referenced in those paragraphs and attached to that supplemental stipu-
lation of facts.  The Court has given the weight, if any, to those stipulated para-
graphs and those stipulated exhibits that the Court considered appropriate.

[*3] sentative of the estate of Mr. Olsen (Mr. Olsen's estate). Ty Olsen resided in Illinois at the time he filed the petition.

Mr. Olsen received a college degree in 1938 from Morningside College (sometimes, Morningside) in Sioux City, Iowa, and a law degree in 1941 from the University of Iowa College of Law. After having served in the U.S. Navy during World War II, Mr. Olsen received a master of laws degree from George Washington University in Washington, D.C. In 1990, Morningside awarded him the honorary degree of doctor of laws.

In 1948, Mr. Olsen began working for Morningside College as the manager of all of that institution's business operations. Sometime thereafter, he served as Morningside's vice president of business until he retired in 1978. Mr. Olsen and his spouse, Grace T. Olsen (Ms. Olsen), who also received a college degree from Morningside College, had a history of making charitable gifts to Morningside College, including gifts in significant amounts.

Mr. Olsen and Ms. Olsen had three children--Ty Olsen, Le T. Olsen (Le Olsen), and Christine A. Olsen (Christine Olsen)--and eight grandchildren.

On November 3, 1994, Mr. Olsen created the Elwood H. Olsen revocable trust (EHO trust). He appointed himself as the trustee of that trust. On the same date, Ms. Olsen created the Grace T. Olsen revocable trust (GTO trust). She ap-

**[*4]** pointed Mr. Olsen as the trustee of that trust. The substantive terms of the EHO trust and the GTO trust are identical.

The terms of the GTO trust directed that on Ms. Olsen's death, if Ms. Olsen's spouse survived her, the trustee was to transfer certain assets of the GTO trust to (1) a so-called Marital Trust that in turn was to be divided into two separate and distinct trusts known as Marital Trust A and Marital Trust B and (2) a separate and distinct trust known as the Family Trust. Thus, pursuant to the terms of the GTO trust, on Ms. Olsen's death, if Mr. Olsen survived her, the assets of that trust were to be distributed to the following three separate and distinct trusts in the respective amounts that the terms of that trust required: (1) Marital Trust A, (2) Marital Trust B, and (3) the Family Trust.

The terms of the GTO trust provided in pertinent part in article VIII the following with respect to the Marital Trust that was to be created on Ms. Olsen's death and that was to be divided into and funded as two separate and distinct trusts known as Marital Trust A and Marital Trust B:

> 1. On the death of the Settlor, if the Settlor's spouse survives the Settlor, the Trustee shall place in a separate trust to be known as the "Marital Trust" an amount equal to the maximum estate tax marital deduction less the value for federal estate tax purposes of the sum of (a) all other items of property includable in the Settlor's gross estate for federal estate tax purposes which qualify for the marital deduction and which pass or have passed to the Settlor's spouse under other

[*5] provisions of this trust, under the Settlor's Will, by right of survivorship with respect to jointly owned property, under settlement arrangements relating to life insurance proceeds not payable to this trust, or otherwise; and (b) the amount necessary to increase the Settlor's taxable estate sufficiently to fully utilize all available credits for federal estate tax purposes, provided that the credit for state death taxes shall be taken into account only to the extent that it does not result in an increase in state death taxes otherwise payable.

2.  In computing this amount, values as finally determined for federal estate tax purposes shall control.  The Trustee shall have the discretion to distribute property in cash or in kind to this trust, provided, that the Trustee shall value the assets at fair market value on the date of distribution.  There shall not be allocated to this trust any property, or the proceeds of any property, which does not qualify for the estate tax marital deduction or as terminable interest property subject to election by the applicable fiduciary of the Settlor's estate to qualify for the marital deduction, or which is subject to foreign death taxes.

3.  The Settlor intends that the value for federal estate tax purposes of the property of this trust shall be available for the marital deduction allowed by the federal estate tax law applicable at the Settlor's death and all questions in connection with this separate trust shall be resolved accordingly.  To this end, the powers and discretions of the Trustee with respect to property in this trust shall not be exercised except in a manner consistent with the Settlor's intentions.  In furtherance of said intention, the Trustee shall, upon demand of the Settlor's spouse, convert or make productive any unproductive property held in this trust.

\*          \*          \*          \*          \*          \*          \*

6.  The Trustee is directed to divide the Marital Trust into two (2) separate trusts to be referred to as "Marital Trust A" and "Marital Trust B".  The Trustee shall place in Marital Trust A trust assets having a value of One Million Dollars ($1,000,000.00) reduced by the

[*6] amount of Generation Skipping Tax Exemption allocated to transfers made by the Settlor during lifetime. The remaining trust property shall be distributed to Marital Trust B. The Trustee is directed as follows with respect to each Marital Trust:

(a) Marital Trust A.

The Trustee is directed as follows with respect to Marital Trust A:

(i) The Trustee shall pay the net income to the Settlor's spouse during such spouse's lifetime in periodic installments, to be paid to the Settlor's spouse not less frequently than annually.

(ii) The Trustee shall, in addition, pay to or apply for the benefit of the Settlor's spouse, so much of the principal of this trust as the Trustee determines to be advisable to provide for the health, education, support and maintenance of the Settlor's spouse.

(iii) Upon the death of the Settlor's spouse, the Trustee shall pay the income for the period between the last income distribution date and the date of the death of the Settlor's spouse as the Settlor's spouse shall appoint by an instrument in writing delivered to the Trustee during such spouse's lifetime executed after the Settlor's death, referring specifically to the power herein given to the Settlor's spouse. Upon the death of the Settlor's spouse, if or to the extent that the Settlor's spouse does not exercise this power to appoint, the Trustee shall distribute such income to such spouse's estate. The Trustee shall pay the then remaining principal according to the terms and conditions and as a part of the Generation Skipping Trust described in a subsequent Article of this trust.

**[\*7]** (b)  <u>Marital Trust B</u>.

The Trustee is directed as follows with respect to Marital Trust B:

(i)  The Trustee shall pay the net income to the Settlor's spouse during such spouse's lifetime in periodic installments, to be paid to the Settlor's spouse not less frequently than annually.

(ii)  The Trustee shall, in addition, pay to or apply for the benefit of the Settlor's spouse, so much of the principal of this trust as the Trustee determines to be advisable to provide for the health, education, support and maintenance of the Settlor's spouse.

(iii)  Upon the death of the Settlor's spouse, the Trustee shall pay the income for the period between the last income distribution date and the date of the death of the Settlor's spouse as the Settlor's spouse shall appoint by an instrument in writing delivered to the Trustee during such spouse's lifetime executed after the Settlor's death, referring specifically to the power herein given to the Settlor's spouse.  Upon the death of the Settlor's spouse, if or to the extent that the Settlor's spouse does not exercise this power to appoint, the Trustee shall distribute such income to such spouse's estate.  The Trustee shall pay the then remaining principal according to the terms and conditions and as a party of the Family Trust described in a subsequent Article of this trust.

The terms of the GTO trust provided in pertinent part in article X the following with respect to the Family Trust that was to be created and funded as a separate and distinct trust on Ms. Olsen's death:

**[\*8]**   Upon the death of the Settlor, the trust property (the words "trust property" shall include all property held in trust under this instrument, except that property, if any, which is required to be placed in a separate trust or distributed pursuant to any preceding Article) shall be held in trust or disposed of as follows:

1.  Until the death of the Settlor's spouse, the Trustee shall, from time to time, pay to or apply for the benefit of the Settlor's spouse, so much of the income and principal of the trust as the Trustee determines to be advisable to provide for the health, education, support and maintenance of the Settlor's spouse.

Upon the death of the Settlor's spouse, or upon the death of the Settlor, if the Settlor's spouse predeceases the Settlor, the Trustee shall divide the Family Trust into as many equal shares as there are then living children of the Settlor and deceased children of the Settlor who have left issue then surviving, each of which shares shall constitute a separate trust.  Each share created on account of a living child of the Settlor shall be held or disposed of in accordance with Section 2 of this Article.  Each share created on account of issue of a deceased child of the Settlor shall be held or disposed of in accordance with Section 3 of this Article.

\*          \*          \*          \*          \*          \*          \*

2.  Each share created on account of a living child of the Settlor shall be distributed to such child free of this trust.

3.  Each share created on account of the then living issue of a deceased child of the Settlor shall be further divided into as many equal shares as there are then living children of a deceased child of the Settlor (hereinafter "grandchild" or "grandchildren") and deceased grandchildren who have left issue then surviving.  Each share created on account of a then living grandchild who has attained the age of twenty-one (21) years shall be distributed to such grandchild free of the trust.  Each share created on account of the then living issue of a deceased grandchild shall be distributed free of this trust to the issue,

**[*9]** per stirpes, of such deceased grandchild.  Each share created on account of each other living grandchild shall be held by the Trustee in a separate trust in accordance with the following provisions:

(a)  The trust property shall be distributed to such grandchild when such grandchild attains the age of twenty-one (21) years.

(b)  Pending final distribution, the Trustee shall pay to or apply for the benefit of such grandchild so much of the income and principal of the trust as the Trustee deems necessary to provide for the health, support, education and maintenance of such grandchild.

(c)  Upon the death of such grandchild, the Trustee shall pay the trust property to such person or persons or the estate of such grandchild as such grandchild shall appoint by a Will referring specifically to the power herein given to such grandchild.  If such grandchild dies before attaining the age of twenty-one (21) years not having exercised such power of appointment, the Trustee shall distribute the trust property to the issue of such deceased grandchild, per stirpes, and if no issue of such deceased grandchild is then living, the Trustee shall distribute the trust property to the issue, per stirpes, of such deceased grandchild's parent and, if no issue of such deceased grandchild's parent is then living, the Trustee shall distribute the trust property to the Settlor's issue, per stirpes, provided that an issue of the Settlor who is then entitled to the income under any other trust established by this Article shall not receive his or her share outright, but such share shall be added to the principal of such other trust and be governed accordingly.  For purposes of this provision, the term "parent" shall be restricted to refer only to a child of the Settlor.

\*        \*        \*        \*        \*        \*        \*

[*10]  5.  Notwithstanding any of the foregoing provisions of this trust, the Trustee shall distribute the principal of this trust as the Settlor's spouse shall appoint by an instrument in writing delivered to the Trustee during such spouse's lifetime or by such spouse's Last Will and Testament to any one or more of the Settlor's children or grand-children, charitable trust or organization which is exempt from income tax under Section 501(c) of the Internal Revenue Code of 1986, as amended, at the time of each transfer.  The power of appointment herein granted to the Settlor's spouse is a special power of appointment and the Settlor's spouse is expressly precluded from appointing to such selfsame spouse, or the creditors of such spouse, or the estate of such spouse, or the creditors of the estate of such spouse, except to the extent otherwise specifically provided for under this Article.

The terms of the GTO trust provided in pertinent part in article IX the following with respect to the so-called Generation Skipping Trust to which, pursuant to article VIII, paragraph 6.(a)(iii), the remaining principal of Marital Trust A was to be transferred on the death of Ms. Olsen's surviving spouse:

1.  The Trustee shall divide the trust property into as many equal shares as there are then living children of the Settlor and deceased children of the Settlor who have left issue then surviving, each of which shares shall constitute a separate trust.

2.  Each share created on account of each living child of the Settlor shall be allocated to such child and shall be held by the Trustee in a separate trust in accordance with the following provisions.  The child for whom such trust is created shall be the sole Trustee of such trust, with the exception of any trust created on account of **CHRISTINE A. OLSEN**, in which case the current designated Trustee shall continue to serve.

(a)  The Trustee, in its sole and uncontrolled discretion, may pay to or apply for the benefit of such child and his or her

[*11] issue so much of the income and principal of the trust as the Trustee deems necessary or advisable to provide for the support, health, education and maintenance of such child or issue.

(b) Upon the death of such child, if such child is survived by issue, the then remaining principal and undistributed income shall be allocated to such issue and shall be held by the Trustee in a separate trust in accordance with the provisions of Section 3 of this Article.

(c) In the event no issue of such deceased child is then living, the Trustee shall pay the then remaining principal and undistributed income to the Settlor's issue, per stirpes; provided, however, than an issue of the Settlor who is then entitled to the income under any other trust established by this Article shall not receive his or her share outright, but such share shall be added to the principal of such other trust and be governed accordingly.

(d) Notwithstanding any of the foregoing provisions of this trust, the Trustee shall distribute the principal of this trust in such amounts or proportions and in trust or outright and under such conditions as such child shall appoint by an instrument in writing delivered to the Trustee during such child's lifetime or by such child's Last Will to any one or more of such child's children or grandchildren. The power of appointment herein granted to such child is a special power of appointment and such child is expressly precluded from appointing to such child, or the creditors of such child, or the estate of such child, or the creditors of the estate of such child.

3. Each share created on account of the then living issue of a deceased child of the Settlor shall be further divided into as many equal shares as there are then living children of a deceased child of the Settlor (hereinafter "grandchild" or "grandchildren") and de-

[*12] ceased grandchildren who have left issue then surviving. Each share created on account of a then living grandchild who has attained the age of twenty-one (21) years shall be distributed to such grandchild, free of the trust. Each share created on account of the then living issue of a deceased grandchild shall be distributed free of this trust to the issue, per stirpes, of such deceased grandchild. Each share created on account of each other living grandchild shall be held by the Trustee in a separate trust in accordance with the following provisions:

(a) The trust property shall be distributed to such grandchild when such grandchild attains the age of twenty-one (21) years.

(b) Pending final distribution, the Trustee shall pay to or apply for the benefit of such grandchild, so much of the income and principal of the trust as the Trustee deems necessary to provide for the health, support, education and maintenance of such grandchild.

(c) Upon the death of such grandchild, the Trustee shall pay the trust property to such person or persons or the estate of such grandchild, as such grandchild shall appoint by a Will referring specifically to the power herein given to such grandchild. If such grandchild dies before attaining the age of twenty-one (21) years not having exercised such power of appointment, the Trustee shall distribute the trust property to the issue of such deceased grandchild, per stirpes, and if no issue of such deceased grandchild is then living, the Trustee shall distribute the trust property to the issue, per stirpes, of such deceased grandchild's parent, and if no issue of such deceased grandchild's parent is then living, the Trustee shall distribute the trust property to the Settlor's issue, per stirpes, provided that an issue of the Settlor who is then entitled to the income under any other trust established by this Article shall not receive his or her share outright, but such share shall be added to the principal of such

[*13] other trust and be governed accordingly. For purposes of this provision, the term "parent" shall be restricted to refer only to a child of the Settlor.

\*      \*      \*      \*      \*      \*      \*

5. Notwithstanding any of the foregoing provisions of this trust, the Trustee shall distribute the principal of this trust as the Settlor's spouse shall appoint by an instrument in writing delivered to the Trustee during such spouse's lifetime or by such spouse's Last Will and Testament, to any one or more of the Settlor's children or grandchildren. The power of appointment herein granted to the Settlor's spouse is a special power of appointment and the Settlor's spouse is expressly precluded from appointing to such selfsame spouse, or the creditors of such spouse, or the estate of such spouse, or the creditors of the estate of such spouse, except to the extent otherwise specifically provided for under this Article.

On November 3, 1995, Mr. Olsen amended the terms of the EHO trust in three respects. On the same date, Ms. Olsen amended the terms of the GTO trust in one respect.

The amendments that Mr. Olsen made on November 3, 1995, to the terms of the EHO trust (1) reduced the bequest under that trust to Morningside by the amounts that Mr. Olsen had directed that that institution was to receive as the beneficiary of a certain annuity account and certain retirement accounts that he maintained; (2) eliminated the requirement in the EHO trust instrument regarding equalization of lifetime gifts to members of Mr. Olsen's family; and (3) provided directions regarding the funding of certain shares in a certain trust known as the

[*14] Family Trust that was to be funded on Mr. Olsen's death with certain property that the EHO trust held at that time.

The amendment that Ms. Olsen made on November 3, 1995, to the terms of the GTO trust eliminated the requirement in that trust regarding equalization of lifetime gifts to members of Ms. Olsen's family.

On December 9, 1998, Ms. Olsen died. At the time of her death, the GTO trust held certain assets of Ms. Olsen. Mr. Olsen continued to serve as the trustee of the GTO trust after Ms. Olsen's death until his death on February 25, 2008.

Mr. Olsen, the personal representative of the estate of Ms. Olsen (Ms. Olsen's estate), signed and filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (Ms. Olsen's estate tax return), for Ms. Olsen's estate.[3] In that return, Mr. Olsen reported that the total value of the assets that the GTO trust held on the date of Ms. Olsen's death was $2,104,695 and that those assets were to be distributed as follows: (1) $1 million to Marital Trust A; (2) $504,695 to Marital Trust B; and (3) $600,000 to the Family Trust.

In Ms. Olsen's estate tax return, Mr. Olsen reported in Schedule M--Bequests, etc., to Surviving Spouse (Schedule M), that pursuant to a "Formula Marital Deduction, Article VIII, GRACE T. OLSON [sic] Revocable Trust"

---

[3]A return preparer also signed Ms. Olsen's estate tax return.

[*15] $1 million in Marital Trust A and $504,695 in Marital Trust B, or a total of $1,504,695, were to pass to Mr. Olsen, Ms. Olsen's surviving spouse. In Ms. Olsen's estate tax return, Mr. Olsen made an election under section 2056(b)(7) with respect to the respective assets that pursuant to the terms of the GTO trust were to be distributed to Marital Trust A and Marital Trust B. (We shall some-times refer to the assets with respect to which Mr. Olsen made an election under section 2056(b)(7) as qualified terminable interest property or QTIP.) In Ms. Olsen's estate tax return, Mr. Olsen claimed a deduction of $1,504,695 from Schedule M with respect to the qualified terminable interest property.

The value of QTIP assets in Ms. Olsen's gross estate that Mr. Olsen re-ported in Ms. Olsen's estate tax return was 71.4923 percent of the total value of all of the assets that Mr. Olsen reported in that return that the GTO trust held on the date of Ms. Olsen's death.

After claiming a marital deduction of $1,504,695, deductions totaling $24,998 for funeral expenses and Ms. Olsen's debts, and an "Allowable unified credit" of $192,800, Mr. Olsen reported zero tax in Ms. Olsen's estate tax return.

During Mr. Olsen's lifetime after Ms. Olsen's death, Mr. Olsen did not, as required by the terms of the GTO trust, (1) segregate the GTO trust into the three separate and distinct trusts, Marital Trust A, Marital Trust B, and the Family Trust,

[*16] and (2) fund them. Nor did Mr. Olsen send to the beneficiaries of the GTO trust any annual accountings for that trust.

On December 31, 2000, the value of the GTO trust had increased to $2,664,583.78.

During Mr. Olsen's lifetime after Ms. Olsen's death, Mr. Olsen, as trustee of the GTO trust, made the following three significant withdrawals from that trust that totaled $1,474,780[4] (GTO trust withdrawals).[5] In May 2002, Mr. Olsen, as trustee of the GTO trust, withdrew $249,550 that he used to make a charitable contribution to Morningside College (May 2002 gift to Morningside).[6] In June 2004, Mr. Olsen, as trustee of the GTO trust, withdrew $831,252 that he used to make another charitable contribution to Morningside (June 2004 gift to Morningside).[7]

---

[4]The parties incorrectly stipulated the total of the three significant withdrawals from the GTO trust to be $1,479,780. The correct total is $1,474,780.

[5]At the respective times Mr. Olsen, as trustee of the GTO trust, made the GTO trust withdrawals he held certain funds in his individual name or in the name of the EHO trust.

[6]Mr. Olsen claimed a charitable contribution deduction for the May 2002 gift to Morningside in Form 1040, U.S. Individual Income Tax Return (Form 1040) that he filed.

[7]Mr. Olsen claimed a charitable contribution deduction for the June 2004 gift to Morningside in Form 1040 that he filed.

[*17] On February 21, 2006, Mr. Olsen, as trustee of the GTO trust, withdrew $393,978 that he deposited into one of his accounts.

On November 23, 2007, Mr. Olsen amended the EHO trust instrument in two respects. Those amendments (1) eliminated from the EHO trust instrument certain provisions in which Mr. Olsen had made conditional gifts to Morningside because he had "taken care of MORNINGSIDE COLLEGE by gifts made after the dates of execution [November 3, 1994] and amendment [November 3, 1995] of the [EHO] trust" and (2) replaced "the phrase 'One Million Dollars ($1,000,000)' in ARTICLE X - GENERATION SKIPPING TRUST, by the phrase 'Two Million Dollars ($2,000,000),' so as to take advantage of current limits on tax-favored generation skipping trusts."

After Mr. Olsen died, Ty Olsen, the personal representative of Mr. Olsen's estate, did not find any records of Mr. Olsen in which Mr. Olsen indicated (1) whether Mr. Olsen had made the GTO trust withdrawals pursuant to a particular provision or authority granted in the GTO trust instrument and (2) whether the source(s) of the GTO trust withdrawals had been Marital Trust A, Marital Trust B, and/or the Family Trust.

On September 30, 2008, after Mr. Olsen's death, Ty Olsen, who is not only the personal representative of Mr. Olsen's estate but also the successor trustee of

[*18] the GTO trust, sent a letter (Ty Olsen's September 30, 2008 letter) addressed to his siblings, Le Olsen and Christine Olsen (Mr. Olsen's children) but not to the grandchildren of Ms. Olsen and Mr. Olsen. In that letter, Ty Olsen informed his siblings that it appeared that Mr. Olsen, as trustee of the GTO trust, did not create and fund after Ms. Olsen died three separate and distinct trusts, Marital Trust A, Marital Trust B, and the Family Trust, although the terms of the GTO trust required him to do so.[8] In that letter, Ty Olsen further advised his siblings that, by that letter, he, as successor trustee of the GTO trust, was creating the three separate and distinct trusts, Marital Trust A, Marital Trust B, and the Family Trust, and was funding the Family Trust with all of the assets that the GTO trust held. That was because, in Ty Olsen's view as successor trustee of the GTO trust, the sources of the GTO trust withdrawals totaling $1,474,780 in 2002, 2004, and 2006, respectively, were Marital Trust A and Marital Trust B.

Ty Olsen's September 30, 2008 letter stated:

This sets forth an allocation of assets which I, as successor trustee, have made in respect of the Grace T. Olsen Trust ("GTO Trust"). This represents a change in certain respects of some things we discussed when I was in Sioux City in May, so I want to set it forth in some detail. I have been thinking about this all summer; I did not

[8]Ty Olsen, Le Olsen, Christine Olsen, and the grandchildren of Mr. Olsen and Ms. Olsen were beneficiaries of Marital Trust A, Marital Trust B, and the Family Trust.

[*19] fully understand the history of the GTO Trust in May, and I think I understand it better now.

The underlying problem is one which we discussed in May. The GTO Trust instrument provides that the assets of the GTO Trust are to be split into a Family Trust and a Marital Trust. The Family Trust assets are not subject to estate tax on Dad's death, and the beneficiaries are the children (Ty, Le and Chris). The Marital Trust assets are subject to estate tax on Dad's death, as part of his estate, and the beneficiaries include the grandchildren. Thus, there is a difference in estate tax treatment and also a difference in beneficial interest between the Family Trust and the Marital Trust. The problem is compounded by the fact that Dad withdrew a substantial part of the asset of the GTO Trust from the trust. So the resulting question is, which of the assets remaining in the GTO Trust, if any, are Family Trust assets, not subject to estate tax, and distributable to the children, and which, if any, are Marital Trust assets, subject to estate tax and distributable to grandchildren?

The source of the problem is that Dad appears never to have made a clear split of the assets of the GTO Trust after Mom's death. There is no special formality which needs to be followed in order to make such a split--a document in a safe deposit box or a letter to an attorney or the beneficiaries would be sufficient. I have investigated this further since we discussed the issue in May. I went again through Dad's papers, looking for some paper trail. I found a letter from David Nielsen, the Omaha attorney who drafted the GTO Trust, reminding Dad that he needed to make the split. That letter referred to another letter he had written to Dad reminding him to make the split. I wrote a letter to Nielsen a couple of weeks ago, asking if he had any record in his files of what had been done. I got a call from Nielsen yesterday; he stated that he had gone through his files and found the two letters advising Dad to make the split but had not found anything from Dad stating which assets were allocated to the Family Trust, and which to the Marital Trust. It remains possible that Dad did make a split, but if so the record of it has been lost.

**[*20]** I note that it should have been possible to reconstruct the split of assets from the GTO Trust tax returns filed since Mom's death, since separate returns should have been filed for the Family Trust and for each of Marital Trusts A and B. Dad did file a GTO Trust tax return for 2000, which appears to have included all income from the GTO Trust. The return used the Employer Identification Number of the Family Trust. But since the return reported all of the income of the GTO Trust, including the Marital Trust portions, I conclude only that Dad had not split up the assets as of the end of the year 2000. In subsequent years, Dad included all of the income to the GTO Trust in his own tax returns. This was technically incorrect but probably did not substantially affect the resulting total tax liability.

I think that I, as successor trustee under the GTO Trust, am still obligated to split up the assets of the GTO Trust, assuming that Dad did not make the split. The language of the trust instrument is as follows:

> "On the death of the Settlor [GTO], if the Settlor's spouse survives the Settlor, the Trustee shall place in a separate trust to be known as the "Marital Trust" an amount equal to the maximum estate tax marital deduction * * *" Article VIII, Section 1.

The Family Trust consists of all of the trust property "except that property, if any, which is required to be place[d] in a separate trust [the Marital Trust] or distributed pursuant to any preceding Article," Article X. Thus, the trustee is required to "place" assets up to a certain value in the Marital Trust "on the death of the Settlor", and everything else goes into the Family Trust. The requirement that the split up of assets be made "on the death of the Settlor" means presumably within a reasonable time after the death of the Settlor, and eight years after death may not be considered to be within a reasonable time. But there is nothing in the trust instrument which appears to relieve the trustee of the obligation to make the split, by reason alone of the lapse of time. I conclude that I have to make the split now, and I am doing it by way of this letter.

[*21] In making the split, I am mindful of the uncertainty as to whether Dad made the split himself, while he was trustee of the GTO Trust, and the record of his doing so has been lost. Assuming that he did make the split, it is almost certainly the case that the assets remaining in the GTO Trust, after the various withdrawals he made over the years, should be treated as Family Trust assets, to the extent possible. The purpose of Mom and Dad's estate plan was to minimize estate tax, and withdrawals from the GTO Trust would increase overall estate tax if they came out of the Family Trust, but would be estate-tax-neutral if they came out of the Marital Trust. Dad would not have withdrawn assets from the Family Trust unless absolutely necessary, and in fact it never was absolutely necessary.

I have reviewed what Dad actually did with the assets of the GTO Trust. I got from Northern Trust Securities account statements going back to the year 2000, and I have spent some time examining and analyzing them. I do not have good records for the Vanguard Accounts, but I have pieced together what happened from the available records in what I consider to be a satisfactory way.

The Marital Trust should have been funded on or about December 31, 2000. The assets in the GTO Trust on December 31, 2000, and their values on that date, were essentially as follows:

| | |
|---|---|
| Northern Trust Securities Acct | $1,637,053.09 |
| Vanguard Accts | 986,022.69 |
| Fidelity Acct | 49,219.77 |
| Hanauer Acct | 41,000.00 (est) |

The total value is accordingly about $2.7 Million. The Marital Trust should have been funded at an amount equal to the marital deduction taken on the estate tax return filed on behalf of Mom's estate, $1,504,695. The remainder, about $1.2 Million, should have gone to fund the Family Trust.

[*22] Dad withdrew assets from the GTO Trust basically for two purposes: to make charitable gifts to Morningside College and to make gifts to family members. The total withdrawals for Morningside College totalled about $1.09 Million. The withdrawals for other purposes, including gifts to family members, totalled about $790,000. The details are as follows:

In the summer of 2004, Dad transferred to Morningside College the following assets from the GTO Trust's Northern Trust Securities Account:

|  | | Value at |
| --- | --- | --- |
|  | Date of gift | 12/29/00 |
| 8400 sh GE | $254,604.00 | $402,678.92 |
| 3179.14 sh Putnam Am Govt Fd | 28,093.35 | 24,538.92 |
| 1219.96 sh Van Kampen Hi-Yield Fd | 12,904.33 | 11,031.31 |
| 2599.98 sh Aim Aggressive Grwth Fd | 24,855.91 | 33,201.74 |
| 1005.025 sh Eaton Vance Prime Res | 43,286.81 | 9,547.74 |
| 2355.88 sh Fidelity Lo-Price Stk Fd | 85,023.75 | 64,560.30 |
| Total | $448,768.15 | [9]$544,558.66 |

No other large withdrawals were made from the Northern Trust Securities account between the time the account was established, in February of 2000, and the date of Dad's death, in February of 2008. He did withdraw income from time to time, and I have not gone over the records in sufficient detail to exclude smaller withdrawals in connection with gifts to family members. After the withdrawals in 2004, the Northern Trust Securities account had a value of $1,043,437.75 (12/31/04 value), so that the total value of the withdrawals plus the remaining assets in the Northern Trust Securities account at the time

---

[9]The total shown in Ty Olsen's September 30, 2008 letter is incorrect.

**[\*23]** the withdrawals were made was just under $1.5 Million, versus the $1.637 Million estate tax value. At the time of Dad's death, the Northern Trust Securities account had a value of $1,069,952.40 (2/29/08 value). The Northern Trust Securities Account is now, and has always been, invested primarily in high quality bonds and mutual funds; this accounts for its stable value over the years.

The assets in the Hannauer account appear to have been transferred to you, Christine, and to Mikey, some time in 2000. They may actually have gone into the Wachovia transfer-on-death account, which was distributed to you shortly after Dad's death.

The Fidelity account referred to in the estate tax return appears to have been held as a separate asset in the Northern Trust Securities account after sometime in 2002.

As to the Vanguard accounts: In May of 2002, Dad transferred 2500 sh of the Vanguard 500 Index Fund, held by the GTO Trust, to Morningside College. The value was $249,550. In addition, in the summer of 2004, he transferred to Morningside College the following positions of the GTO Trust in Vanguard funds:

| | |
|---|---|
| 1896.781 sh Vanguard Explorer | $129,189.75 |
| 440.239 sh Vanguard Intl Grwth | 7,400.42 |
| 6373.742 sh Vanguard Morgan Grwth | 98,793.00 |
| 366.992 sh Vanguard U.S. Grwth | 5,759.11 |
| 5333.305 sh Vanguard Windsor II | 149,444.50 |
| Total | $390,586.78 |

The grand total of the Vanguard withdrawals made for gifts to Morningside College was just over $640,000. After the withdrawals in 2004, the value of Vanguard accounts held by the GTO Trust was approximately $400,000. Dad cashed in the remaining GTO Trust

[*24] Vanguard accounts in 2006; their value at that time was $395,103.31. The purpose was to raise cash to make annual gifts to family members. At the time of Dad's death, the Vanguard accounts had accordingly been closed.

The conclusion is that the assets withdrawn from the GTO Trust were

| | |
|---|---|
| Northern Trust Securities Account | [10]$544,558.66 (12/29/00 value) |
| Vanguard accounts | 986,022.69 (estate t[a]x value) |
| | _____ |
| Total | $1,530,581.35 |

I hereby allocate the assets held by the GTO Trust in Vanguard accounts and all of the assets Dad withdrew from the GTO Trust and contributed to Morningside College in the summer of 2004, except for the 3179.74 shares of the Putnam American Government Fund so contributed, to the Marital Trust. The remainder of the assets in the Northern Trust Securities, together with the 3179.74 shares of the Putnam American Government Fund, are accordingly Family Trust assets, so that, in particular, all assets currently held in the Northern Trust Securities account maintained by the GTO Trust are Family Trust assets. Since all of the assets of the Marital Trust have been withdrawn from the trust, it is unnecessary to specify the division of assets between Marital Trust A and Marital Trust B.

A few closing remarks:

First, this is different from the approach I proposed in May, in that the assets currently held in the GTO Trust will be distributed to the three of us, regardless of what the IRS does. The IRS may claim that it is not bound by the allocation of assets made here and take the position that part or all of the assets currently held in the GTO Trust's account with Northern Trust Securities are subject to estate tax. If so, we will have to decide whether and to what extent to fight the IRS over the

_____

[10]See supra note 9.

[*25] issue. But after the fight is over, the remaining assets in the GTO Trust will be distributed to the three of us, in equal shares, free of the trust, and no portion will go to our children, as would have been the case if some of the assets were Marital Trust A assets.

Second, I changed my mind about this because I think I am obligated under the trust instrument to make a determination on the issue, rather than in effect to leave it open pending IRS review, as we had discussed earlier. And I think that the allocation I make here is the only one which makes sense in light of Mom's and Dad's estate plan and what Dad actually did. In fact, my guess is that he thought that it made sense to withdraw the assets from the GTO Trust which were in any event going to be part of his estate--the Marital Trust assets--so as to simplify matters to the extent possible. The dollars match up so closely that it is hard to believe that he did not have this in mind. If he made a written record of his decision, however, it is now lost.

Third, if you think that my decision is incorrect, or if you otherwise wish your share of the GTO Trust assets to go directly to your children, I suggest that you consider executing still another disclaimer, of your interest in the Family Trust created under Article X of the GTO Trust. I do not plan to disclaim, but you may wish to. If you do wish to disclaim, I will be happy to prepare and to send you an appropriate disclaimer form. You should let me know as soon as possible.

Fourth, I am going to send a copy of this letter to each of my daughters, since their interests are affected, and since I want to keep them informed. I propose to let you communicate with your children in whatever way you see fit.

Fifth, I apologize for being slow on this. My excuse is that I have struggled with this issue.

**[\*26]** The beneficiaries of the GTO trust who were also the beneficiaries of the EHO trust did not object to the allocations and positions that Ty Olsen took in Ty Olsen's September 30, 2008 letter.

On November 25, 2008, Ty Olsen, as the personal representative of decedent's estate, filed Form 706 (Mr. Olsen's estate tax return). In that return, Ty Olsen did not include any portion of the value of the GTO trust in the value of Mr. Olsen's gross estate.

Respondent issued a notice of deficiency (notice) with respect to Mr. Olsen's estate. In that notice, respondent determined to include in the value of Mr. Olsen's gross estate under section 2044 the $1,071,224 which respondent determined was the value of the GTO trust "as of decedent's date of death"[11] that is allocable to Marital Trust A and Marital Trust B.

## OPINION

The estate bears the burden of establishing that the determination in the notice, as modified,[12] is erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S.

---

[11]Respondent stipulated that the value of the GTO trust on the applicable alternate valuation date was $1,001,905.51, not $1,071,224 as respondent determined in the notice.

[12]See supra note 11. The parties agree that the value of all of the assets that the GTO trust held on the applicable alternate valuation date was $1,001,905.51.

**[\*27]** 111, 115 (1933). That this case was submitted fully stipulated does not change that burden or the effect of a failure of proof. See Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991).

It is respondent's position that the estate is required under section 2044 to include in the value of Mr. Olsen's gross estate $1,001,905.51, the value on the applicable alternate valuation date of all of the assets that the GTO trust held on the date of Mr. Olsen's death.[13] As pertinent here, section 2044 requires the estate to include in the value of Mr. Olsen's gross estate the value of any property in which he had a qualifying income interest for life if a deduction was allowed with respect to the transfer of the property to him by reason of section 2056(b)(7).[14] See sec. 2044(a) and (b)(1)(A).

---

[13]It is respondent's alternative position that under Estate of Soberdash v. Commissioner, T.C. Memo. 1997-362, 1997 WL 438763, the estate is required to include in the value of Mr. Olsen's gross estate $716,285.29, the value on the applicable alternate valuation date of 71.4923 percent of the assets that the GTO trust held on the date of Mr. Olsen's death. See infra note 18.

[14]The terms of the GTO trust required the trustee of that trust, Mr. Olsen, to transfer to Marital Trust A and Marital Trust B the minimum pecuniary amount necessary to claim a marital deduction under sec. 2056(a) in an amount that would result in the elimination of any estate tax with respect to Ms. Olsen's estate. In Ms. Olsen's estate tax return, Mr. Olsen, the personal representative of her estate, made a QTIP election under sec. 2056(b)(7) and claimed a marital deduction of $1,504,695.

[*28] The parties agree that the respective values of any assets that Marital Trust A and Marital Trust B (sometimes collectively Marital Trusts) held on the date of Mr. Olsen's death are includible in the value of his gross estate under section 2044 and that the respective values of any assets that the Family Trust held on that date are not includible in the value of his gross estate. However, after Ms. Olsen died Mr. Olsen, as trustee of the GTO trust, did not (1) segregate the GTO trust into the three separate and distinct trusts, Marital Trust A, Marital Trust B, and the Family Trust, and (2) fund them, as required by the terms of that trust. As a result, resolution of the issue presented under section 2044 is not as straightforward as it would have been if Mr. Olsen had done so.

Resolution of the issue presented under section 2044 is further complicated by the following facts. After Ms. Olsen died Mr. Olsen, as trustee of the GTO trust, made the following three significant withdrawals from that trust that totaled $1,474,780.[15] In May 2002, Mr. Olsen, as trustee of the GTO trust, withdrew $249,550 that he used to make a charitable contribution to Morningside College.[16]

---

[15]At the respective times Mr. Olsen, as trustee of the GTO trust, made the GTO trust withdrawals he held certain funds in his individual name or in the name of the EHO trust.

[16]Mr. Olsen claimed a charitable contribution deduction for the May 2002 gift to Morningside in Form 1040 that he filed.

[*29] In June 2004, Mr. Olsen, as trustee of the GTO trust, withdrew $831,252 that he used to make another charitable contribution to Morningside.[17]  On February 21, 2006, Mr. Olsen, as trustee of the GTO trust, withdrew $393,978 that he deposited into one of his accounts.  Moreover, Mr. Olsen, as trustee of the GTO trust, did not provide any accountings for the GTO trust withdrawals to that trust's beneficiaries.  In addition, after Mr. Olsen died Ty Olsen, the personal representative of Mr. Olsen's estate and the successor trustee of the GTO trust, did not find any records of Mr. Olsen in which Mr. Olsen indicated (1) whether he had made the GTO trust withdrawals pursuant to a particular provision or authority granted in the GTO trust instrument and (2) whether the source(s) of the GTO trust withdrawals was/were Marital Trust A, Marital Trust B, and/or the Family Trust.

It is the position of the estate that the Marital Trusts should not be considered to have held any assets of the GTO trust on the date of Mr. Olsen's death, that the Family Trust should be considered to have held all of the assets of the GTO trust on that date, and that consequently the value of none of the assets that the GTO trust held on the date of Mr. Olsen's death is includible in the value of his gross estate.

---

[17]Mr. Olsen claimed a charitable contribution deduction for the June 2004 gift to Morningside in Form 1040 that he filed.

**[\*30]** It is the position of respondent that the Family Trust should not be considered to have held any of the assets of the GTO trust on the date of Mr. Olsen's death, that the Marital Trusts should be considered to have held all of the assets of the GTO trust on that date, and that consequently the respective values of all of the assets that the GTO trust held on the date of Mr. Olsen's death are includible in the value of his gross estate.[18]

In support of its position that no portion of the assets of the GTO trust is includible in Mr. Olsen's estate, the estate advances various contentions and arguments. We have considered all of the contentions and arguments of the estate. We address in detail the principal contentions and arguments of the estate that are relevant to our resolution of the issue presented under section 2044 and that are based upon facts established by the record.[19]

---

[18]It is respondent's alternative position that the Family Trust should be deemed to hold 28.5077 percent of the assets that the GTO trust held on the date of Mr. Olsen's death and that the Marital Trusts should be deemed to hold 71.4923 percent of the assets that the GTO trust held on that date. See supra note 13.

[19]Among the arguments that the estate advances in support of its position on the issue presented under sec. 2044 and that we do not address in any detail are (1) that "[r]espondent's position contravenes the intent expressed in Grace's [Ms. Olsen's] estate plan [i.e., the GTO trust instrument] to utilize her Unified Credit [under sec. 2010] for the benefit of her descendants", (2) that Mr. Olsen breached his fiduciary duties as trustee of the GTO trust, and (3) that the beneficiaries of that trust had claims against the estate because of those breaches that they did not

(continued...)

**[*31]** In support of the estate's position that the value of none of the assets of the GTO trust held on the date of Mr. Olsen's death is includible in the value of his gross estate, the estate argues on brief that the GTO trust

> [w]ithdrawals should be treated as having come from the Marital Trusts based on the settlor's [Ms. Olsen's] intent expressed in Grace's Trust [GTO trust instrument] and based on the trustee's [Mr. Olsen's] duty to minimize estate taxes for the benefit of the remainder beneficiaries. If the Withdrawals are treated as having come from the Mari-

---

[19](...continued)
pursue in the light of certain actions that Ty Olsen, the personal representative of Mr. Olsen's estate and the successor trustee of the GTO trust, took after Mr. Olsen died, including his action to allocate "the remaining $1,001,905.51 balance of Grace's Trust [GTO trust] to the Family Trust". With respect to the estate's allegations regarding Ms. Olsen's intent expressed in the GTO trust instrument, suffice it to say that the estate of Ms. Olsen used the unified credit in Ms. Olsen's estate tax return to the extent necessary to reduce that estate's estate tax liability to zero, that, as the parties agree, any assets in the Family Trust at Mr. Olsen's death are not includible in the value of his gross estate, and that, as discussed below, it was Ms. Olsen's intent, as explicitly provided in article X, paragraph 5, of the GTO trust to require the trustee of that trust, Mr. Olsen, to distribute the principal of the Family Trust as her surviving spouse, Mr. Olsen, appointed to charitable organizations exempt from Federal income tax (tax), such as Morningside College. With respect to the estate's allegations regarding Mr. Olsen's breaches of his fiduciary duties as trustee of the GTO trust and the actions that Ty Olsen took after Mr. Olsen died, we conclude that those allegations are irrelevant to our resolution of the issue presented under sec. 2044. See Estate of Soberdash v. Commissioner, 1997 WL 438763, at *3. Moreover, on the record before us, we find that the estate did not carry its burden of establishing (1) that Mr. Olsen breached any such duties and (2) that the beneficiaries of the GTO trust had any legally enforceable claims against Mr. Olsen's estate.

[*32] tal Trusts * * *,[20] the Marital Trusts were thereby effectively depleted by the time Elwood [Mr. Olsen] died, and therefore the remaining balance of Grace's Trust would be allocated to the Family Trust.

In support of respondent's position that the respective values of all of the assets that the GTO trust held on the date of Mr. Olsen's death are includible in the value of his gross estate, respondent argues in respondent's opening brief:

> [A]ll of the [GTO] trust assets remaining at decedent's death are includible in his estate because the [Internal Revenue] Service correctly determined that the prior distributions from the GTO trust [GTO trust withdrawals] were properly appointed pursuant to Mr. Olsen's inter vivos power of appointment from the Family Trust to charity and for his personal benefit in accordance with the provisions of the GTO trust.

Respondent expands on the foregoing argument in respondent's answering brief as follows:

> Throughout petitioner's brief, petitioner describes the decedent Elwood H. Olsen ("Mr. Olsen") and his predeceased wife Grace T. Olsen ("Mrs. Olsen") as generous contributors to Morningside College and other charitable organizations. A significant portion of petitioner's brief is devoted to describing Mr. Olsen as nothing short of an exemplary philanthropist. Mr. and Mrs. Olsen's pattern of

---

[20]According to the estate, sec. 20.2044-1(d)(3), Estate Tax Regs., "supports the proposition that the [GTO trust] withdrawals can be treated by Elwood's [decedent's] personal representative as having been made from the Marital Trusts". We disagree. Neither those regulations nor the facts established by the record support that assertion of the estate. In this connection, we note that the estate has failed to carry its burden of establishing that it satisfies the requirements of sec. 20.2044-1(d)(3), Estate Tax Regs.

[*33] magnanimous charitable donations is consistent with the terms of the Grace T. Olsen Revocable Trust ("GTO Trust") in that Mr. and Mrs. Olsen specifically created the trusts in a manner which gave Mr. Olsen the unique ability to direct charitable donations from the Family Trust. Thus, respondent's determination that Mr. Olsen's withdrawals [GTO trust withdrawals] depleted the Family Trust is correct, both as a matter of law[1] and on the face of the GTO trust documents themselves.

In fact, Mr. and Mrs. Olsen ensured that their pattern of charitable donations would continue by including the GTO trust provisions in Article X, paragraph 5 that provided a special power of appointment permitting Mr. Olsen, as trustee, to distribute principal of the Family Trust to charitable trusts or other § 501(c)(3) organizations. * * * Petitioner's brief ignores these important provisions in a contorted effort to exclude qualified terminable interest property ("QTIP") from decedent's gross estate by claiming, with no evidentiary support, that decedent mismanaged the trusts.[2]

[1][S]ection 2056(b)(7)(B)(ii)(II) prohibits a person from having a power to appoint QTIP to any person other than the surviving spouse.

[2]As discussed in respondent's opening brief, the possibility of mismanagement of the trusts has no bearing on the inclusion of QTIP under I.R.C. § 2044.

The estate counters respondent's argument about Mr. Olsen's authority under article X, paragraph 5, of the GTO trust instrument by contending, inter alia, that Mr. Olsen did not have an inter vivos power of appointment over the Family Trust, that the Family Trust had not been funded at the time of the GTO trust withdrawals, and that Mr. Olsen was not permitted to appoint assets of the Family Trust for his personal benefit.

**[\*34]** On the record before us, we agree (1) with respondent that $1,080,802 of the GTO trust withdrawals should be considered to have been made from the Family Trust[21] and (2) with the estate that $393,978 of those withdrawals should be considered to have been made from the Marital Trusts.[22] Ms. Olsen's intent, as expressed in the GTO trust instrument that she created, included providing Mr. Olsen with the authority as her surviving spouse (1) to appoint principal of the Family Trust to, inter alia, one or more tax-exempt charitable organizations, such as Morningside College, and (2) to pay to or apply for the benefit of Ms. Olsen's surviving spouse, Mr. Olsen, so much of the principal of the Marital Trusts as the trustee, Mr. Olsen, determined to be advisable to provide for the health, education, support, and maintenance of that surviving spouse.

The following provision in article X, paragraph 5, of the GTO trust instrument explicitly authorized Mr. Olsen, as trustee, to distribute principal of the Fam-

---

[21]We agree with respondent that the respective withdrawals totaling $1,080,802 that Mr. Olsen, as trustee of the GTO trust, made in May 2002 and June 2004 and that he used to make charitable contributions to Morningside College, are consistent with article X, paragraph 5, of the GTO trust relating to distributions from the Family Trust.

[22]We agree with the estate that the withdrawal of $393,978 that Mr. Olsen, as trustee of the GTO trust, made in February 2006 and that he deposited into one of his accounts, is consistent with article VIII, paragraph 6(a)(ii) and (b)(ii), of the GTO trust relating to distributions from Marital Trust A and Marital Trust B, respectively.

**[*35]** ily Trust to, inter alia, one or more tax-exempt charitable organizations, such as Morningside College:

5. Notwithstanding any of the foregoing provisions of this trust, the Trustee shall distribute the principal of this trust as the Settlor's spouse shall appoint by an instrument in writing delivered to the Trustee during such spouse's lifetime or by such spouse's Last Will and Testament to any one or more of the Settlor's children or grand-children, charitable trust or organization which is exempt from income tax under Section 501(c) of the Internal Revenue Code of 1986, as amended, at the time of each transfer. The power of appointment herein granted to the Settlor's spouse is a special power of appointment and the Settlor's spouse is expressly precluded from appointing to such selfsame spouse, or the creditors of such spouse, or the estate of such spouse, or the creditors of the estate of such spouse, except to the extent otherwise specifically provided for under this Article [X].

The following provisions in article VIII, paragraph 6(a)(ii) and (b)(ii), of the GTO trust instrument explicitly authorized Mr. Olsen, as trustee of that trust, to distribute principal of the Marital Trusts to himself as Ms. Olsen's spouse:

6. The Trustee is directed to divide the Marital Trust into two (2) separate trusts to be referred to as "Marital Trust A" and "Marital Trust B". The Trustee shall place in Marital Trust A trust assets having a value of One Million Dollars ($1,000,000.00) reduced by the amount of Generation Skipping Tax Exemption allocated to transfers made by the Settlor during lifetime. The remaining trust property shall be distributed to Marital Trust B. The Trustee is directed as follows with respect to each Marital Trust:

    (a) Marital Trust A.

        The Trustee is directed as follows with respect to Marital Trust A:

[*36] *     *     *     *     *     *     *

> (ii) The Trustee shall, in addition, pay to or apply for the benefit of the Settlor's spouse, so much of the principal of this trust as the Trustee determines to be advisable to provide for the health, education, support and maintenance of the Settlor's spouse.

*     *     *     *     *     *     *

> (b) <u>Marital Trust B</u>.
>
> The Trustee is directed as follows with respect to Marital Trust B:

*     *     *     *     *     *     *

> (ii) The Trustee shall, in addition, pay to or apply for the benefit of the Settlor's spouse, so much of the principal of this trust as the Trustee determines to be advisable to provide for the health, education, support and maintenance of the Settlor's spouse.

On the record before us, we reject respondent's argument that the GTO trust withdrawal of $393,978 that Mr. Olsen, as trustee of the GTO trust, made in February 2006 and that he deposited into one of his accounts[23] should be considered to have been made from the Family Trust. Article X, paragraph 5, of the GTO trust instrument explicitly prohibited Mr. Olsen, as the surviving spouse of Ms. Olsen,

---

[23]As discussed <u>infra</u>, we agree with respondent that Mr. Olsen, as trustee of the GTO trust, was permitted to appoint to Morningside College $1,080,802 of the GTO trust withdrawals that he made in May 2002 and June 2004.

[*37] from appointing any part of the Family Trust for his own benefit except as otherwise provided by the GTO trust. The only exception to the foregoing prohibition is found in article X, paragraph 1, of the GTO trust instrument. Under article X, paragraph 1, of the GTO trust instrument, the trustee, Mr. Olsen, is permitted to make discretionary distributions of income and principal for the benefit of Ms. Olsen's surviving spouse, Mr. Olsen, as the trustee "determines to be advisable to provide for the health, education, support and maintenance of the Settlor's [Ms. Olsen's] spouse." On the record before us, we are persuaded that Ms. Olsen did not intend that the trustee make, and that the trustee did not make, any such discretionary distributions of income or principal from the Family Trust under article X, paragraph 1, of the GTO trust instrument before the trustee had exhausted the principal of the Marital Trusts by making discretionary distributions of principal from those trusts as authorized by article VIII, paragraph 6(a)(ii) and (b)(ii), of the GTO trust instrument.

On the record before us, we reject the estate's argument that the GTO trust withdrawals totaling $1,080,802 that Mr. Olsen, as trustee of the GTO trust, made in May 2002 and June 2004 and that he used to make charitable contributions to Morningside College should not be considered to have been made from the Family Trust. It is not material to our resolution of the issue presented under section 2044

[*38] whether, as the estate maintains, (1) Mr. Olsen, as the surviving spouse of Ms. Olsen, did not have an inter vivos power of appointment over the Family Trust and (2) the Family Trust had not been funded at the time of the GTO trust withdrawals. Mr. Olsen's actions of withdrawing from that trust $249,550 in May 2002 and $831,252 in June 2004, or a total of $1,080,802, and contributing the respective amounts withdrawn to Morningside College are consistent with the authority granted to him under article X, paragraph 5, of the GTO trust instrument relating to distributions from the Family Trust[24] and not consistent with the authority granted to him under article VIII, paragraph 6(a)(ii) and (b)(ii), of the GTO trust instrument relating to distributions from Marital Trust A and Marital Trust B, respectively.

Based upon our examination of the entire record before us, we find that $1,080,802 of the GTO trust withdrawals are considered to have been made from the Family Trust and that $393,978 of those withdrawals are considered to have been made from the Marital Trusts. On that record, we further find that the estate is required under section 2044 to include in the value of decedent's gross estate $607,927.51, which is $1,001,905.51, the stipulated value of the GTO trust on the

---

[24]Mr. Olsen's actions are also consistent with the history of Mr. Olsen and Ms. Olsen of making significant gifts to Morningside College.

**[*39]** applicable alternate valuation date that respondent determined to consist entirely of assets of the Marital Trusts, reduced by $393,978, the GTO trust withdrawal that we have found Mr. Olsen made from the Marital Trusts in February 2006.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

Decision will be entered under

Rule 155.